UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE
MDD_TJSchambers@mdd.uscourts.gov

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-4560
Fax (410) 962-3630

March 12, 2014

LETTER TO COUNSEL

RE:  *James W. Thompson v. Commissioner of Social Security*
     Case No. TJS-12-3331

Dear Counsel:

This matter is before me by the parties' consent. (ECF Nos. 3 & 7). On November 14, 2012, Plaintiff James W. Thompson ("Mr. Thompson") petitioned this Court to review the Social Security Administration's final decision to deny his claim for Supplemental Security Income ("SSI"). (ECF No. 1). I have considered Mr. Thompson's Motion for Summary Judgment (ECF No. 15) and the Commissioner's Motion for Summary Judgment (ECF No. 16). I find that no hearing is necessary. *See* Loc. R. 105.6. This Court must uphold the decision of the agency if it is supported by substantial evidence and if the agency employed the proper legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). For the reasons that follow, I will grant the Commissioner's motion and deny Mr. Thompson's motion. This letter explains my rationale.

On January 23, 2009, Mr. Thompson filed an application for SSI alleging disability commencing January 1, 2006. (Tr. 125-131). Mr. Thompson's claim was denied initially on March 27, 2009 (Tr. 66-69), and upon reconsideration on June 5, 2009 (Tr. 72-73). A hearing was held on May 10, 2011 before an Administrative Law Judge ("ALJ"). (Tr. 27-56). Following the hearing, on June 22, 2011, the ALJ determined that Mr. Thompson was not disabled within the meaning of the Social Security Act during the relevant time frame. (Tr. 14-26). The Appeals Council denied Mr. Thompson's request for further review of the ALJ's decision. (Tr. 1-5). The ALJ's decision dated April 20, 2011 constitutes the final, reviewable decision of the agency.

The ALJ evaluated Mr. Thompson's claim for benefits using the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. At step one, the ALJ found that Mr. Thompson was not engaged in substantial gainful activity, and had not been engaged in substantial gainful activity since May 15, 2009. (Tr. 19). At step two, the ALJ found that Mr. Thompson suffered from the severe impairments of "degenerative disc disease, asthma and functional psychiatric disorder." (Tr. 19). At step three, the ALJ found that Mr. Thompson's impairments, separately and in combination, failed to meet or equal in severity any listed impairment. (Tr. 20).

The ALJ then determined that, despite Mr. Thompson's severe impairments, he retained the residual functional capacity ("RFC") to:

perform light work as defined in 20 CFR 416.967(b) except: claimant requires unskilled work; never climbing ladders, ropes or scaffolds; only occasional kneeling, crouching, crawling, bending and climbing ramps and stairs; no reaching above shoulder; no exposure to concentrations of dust, fumes, gases etc.

(Tr. 21).

At step four, the ALJ determined that Mr. Thompson was unable to perform past relevant work as a laborer or mechanic. (Tr. 25). At step five, however, the ALJ determined that considering Mr. Thompson's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 25). As a result of this determination, the ALJ found that Mr. Thompson was not disabled during the relevant time frame.

Mr. Thompson presents six arguments on appeal: (1) that the ALJ should have found that Mr. Thompson's obesity was a severe impairment at step two; (2) that the ALJ should have found that Mr. Thompson met Listing 12.03; (3) that the ALJ did not properly analyze Mr. Thompson's RFC; (4) that the ALJ did not comply with the treating physician rule; (5) that the ALJ's hypothetical question to the vocational expert was inadequate; and (6) that the ALJ failed to give Mr. Thompson's claim full and fair consideration. I will address each argument in turn.

First, Mr. Thompson argues that the ALJ erred in not finding his obesity as a severe impairment at step two of the sequential evaluation process. (ECF No. 15-1 at 19). Mr. Thompson states that objective medical evidence in the record indicates that he has a body mass index ("BMI") of 40. (*Id.*) (citing Tr. 310). Mr. Thompson notes that SSR 02-1p[1] provides that this BMI correlates with "level III 'extreme' obesity," and argues that his obesity, considered in light of his degenerative disc disease and asthma, requires that his obesity itself be considered a severe impairment. (*Id.* at 20).

At step two, the ALJ must consider the severity of an impairment both individually and in combination with a claimant's other impairments. *See* 20 C.F.R. § 416.920; *Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir. 1986) (the Agency "must make a specific and well-articulated finding as to the effect of the combination of impairments") (citations omitted). An impairment is "severe" unless it "has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). The claimant carries the burden of showing how his obesity affects his ability to perform work-related functions. *See*

---

[1] SSR 02-1p, 2000 WL 628049 at *2 (S.S.A. Sept. 12, 2002) states:

The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

2

*Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (finding that the applicant bears the burden of production and of proof during the first four steps of the inquiry).

Here, the ALJ determined that Mr. Thompson has the severe impairments of degenerative disc disease, asthma, and functional psychiatric disorder. (Tr. 19). While there is evidence in the record to indicate that Mr. Thompson is obese, the record does not reflect any functional limitations resulting from his obesity. Between January 2009 and December 2010, Mr. Thompson's BMI fluctuated between 27 and 40. While Mr. Thompson's BMI increased from 2009 through 2010, this is not the consistent pattern of obesity mentioned in SSR-02-1p. 2000 WL 628049 at *2 ("We will consider the individual to have obesity as long as his or her weight or BMI shows essentially a consistent pattern of obesity."). That his obesity has not been consistent may account for the lack of documentation in the record related to any functional limitations resulting from his obesity. During the hearing (Tr. 27-56), no mention was made of Mr. Thompson's obesity or any functional limitations resulting therefrom, and Mr. Thompson's motion for summary judgment contains no more than a speculative suggestion that his obesity is a severe impairment. While obesity is known to exacerbate other health issues, including musculoskeletal problems, the ALJ adjusted Mr. Thompson's RFC to account for those limitations. Because Mr. Thompson has not identified how his obesity limited him to a greater extent than the ALJ found, he has failed to carry his burden. *See Brown v. Astrue*, No. JKS–09–1792, 2011 WL 129006, at *2 (D. Md. Jan. 14, 2011) ("Having identified no evidence to suggest that his obesity caused greater limitations than the ALJ assigned, [the plaintiff] has shown no basis for remand.").

Next, Mr. Thompson argues that he meets Listing 12.03[2] and, in a related argument, that the ALJ failed to properly weigh the medical opinions of his treating physicians. He points to the opinions of Dr. Sharito Quintero-Howard (that he suffers from a schizo-affective disorder with hallucinations, feelings or paranoia and related symptoms, and he has marked restrictions in activities of daily living, marked restrictions in maintaining social functioning, and marked restrictions in concentration, persistence or pace) and Dr. Emily Sippel (that he has frequent deficits in compensation, persistence and pace, along with three or more episodes of decompensation) in support of his position that he meets the Part A and Part B requirements of

---

[2] Listing 12.03 provides, in pertinent part:

The required level of severity for these disorders is met when the requirements in both A and B, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one or more of the following: 1. Delusions or hallucinations . . . AND B. Resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. § 404 app. 1.

the Listing.[3] Mr. Thompson also notes that the "SSR's own examining psychiatrist opined that [the claimant] qualified for benefits." (ECF No. 15-1 at 21) (citing Tr. 275).

Where there is factual support that a listing could be met, an ALJ must analyze whether the claimant's impairment meets or equals the listing. *See Cook*, 783 F.2d at 1173. However, "[u]nder *Cook*, the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 645 (D. Md. 1999). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original); *see also* 20 C.F.R. § 416.925(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria of the listing."). The claimant bears the burden of demonstrating that his impairment meets or equals a listed impairment. *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986). An ALJ must consider the requirements for meeting a listing set forth in Appendix 1, but "it is not required that the [ALJ] mechanically recite the evidence leading to her determination." *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986).

Where a claimant alleges a mental impairment, the ALJ must follow a "special technique" outlined in 20 C.F.R. § 416.920a. The first step of this technique requires the ALJ to evaluate a claimant's "pertinent symptoms, signs and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment. 20 C.F.R. § 416.920a(b). Next, the ALJ must rate the degree of the claimant's functional limitations based on the "extent to which [the] impairment(s) interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id*. at (c)(2). The ALJ must then rate the claimant's degree of limitation in (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* at (c)(3). For the first three areas, a claimant's limitations may be rated as "[n]one, mild, moderate, marked, [or] extreme." *Id*. To rate a claimant's degree of limitation with respect to episodes of decompensation, the ALJ uses a four-point scale, and rates the limitation as "[n]one, one or two, three, [or] four or more." *Id*. at (c)(4). Once the ALJ has rated the claimant's functional limitations, the ALJ must determine whether the mental impairment meets, or is equivalent to, a listed mental disorder. *Id*. at (d)(2); 20 C.F.R., Pt. 404, Subpt. P, App. 1 ("Listing of Impairments"). If the ALJ determines that the claimant's mental impairment does not meet, or is not equivalent to, a mental disorder in any Listing, the ALJ will then assess the claimant's RFC. *Id*. at (d)(3).

In this case, while the ALJ evaluated Mr. Thompson's impairments against Listing 12.03, 12.04 and 12.09 (Tr. 20-21), only Listing 12.03 is at issue. (ECF No. 15-1 at 20-21). The ALJ found that Mr. Thompson did not meeting Listing 12.03 because he had only "mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration[,] persistence and pace; and . . . has not experienced any episodes of

---

[3] Mr. Thompson does not argue that he meets the requirements of Part C of Listing 12.03.

decompensation of extended duration." (Tr. 20). The ALJ credited a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment completed by F. Ewell, Ph.D on January 29, 2010. (Tr. 23). Dr. Ewell stated that Mr. Thompson did not meet Listing 12.03, and that he had only "moderate restrictions in all domains." (Tr. 20). The ALJ rejected the opinion of Dr. Emily Sippel that Mr. Thompson had "repeated episodes of decompensation" because the opinion was based on only one visit, was not supported by any objective medical evidence, and because Dr. Sippel provided "little rationale for the opinion." (Tr. 22). The ALJ discounted the opinion of Dr. Howard that Mr. Thompson had "marked limitations in all domains" because of a short-term treating relationship (six months) and because the limitations Dr. Howard listed "existed 18 years prior [to Mr. Thompson's alleged disability]," contemporaneous to a time when Mr. Thompson engaged in substantial gainful activity. (Tr. 22).

To determine the weight assigned to medical opinions, the Commissioner considers six factors: (1) the examining relationship between the source and the claimant; (2) the length, nature, and extent of the treatment relationship between the source and the claimant; (3) the supportability of the source's opinions; (4) the consistency of the source's opinions with the record as a whole; (5) any specialized expertise of the source; and (6) other factors which the claimant may bring to the Commissioner's attention. 20 C.F.R. § 416.927(c). The regulations state a preference for medical sources that have a treatment relationship with the claimant, because they are "most able to provide a detailed, longitudinal picture" and "may bring a unique perspective to the medical evidence." 20 C.F.R. § 416.927(c)(2). When the adjudicator does not give controlling weight to a treating source, that decision must be justified in the notice of decision by an application of the factors listed above. *Id*. For medical sources that have not examined or treated the claimant, the adjudicator must assign weight depending on the degree to which they provide supporting explanations for their opinions. 20 C.F.R. § 416.927(c)(3).

Here, the ALJ properly weighed the opinions of Dr. Howard and Dr. Sippel. Dr. Howard indicated that Mr. Thompson had marked limitations in all domains, but his opinion is based on nothing more than a recitation of Mr. Thompson's subjective complaints. Dr. Howard's opinion does not reference or attach any objective evidence to support the opinion. (Tr. 22, 318-330). Where an opinion is based on a claimant's subjective reports and not supported by objective medical evidence, an ALJ may reject the opinion. *See Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ also properly discounted Dr. Sippel's opinion that Mr. Thompson has repeated episodes of decompensation. (Tr. 22, 259-262). This assessment was not supported by clinical or laboratory findings, or any other objective evidence. Dr. Sippel formed this opinion based on one visit with Mr. Thompson, and provided no explanation for the opinion. Accordingly, the ALJ properly found that Dr. Sippel's opinion was entitled to little weight.

Because the ALJ properly discounted or rejected Dr. Howard and Dr. Sippel's opinions, which serve as the sole basis for Mr. Thompson's claim that he meets Listing 12.03, the ALJ did not err by finding that Mr. Thompson did not meet the Listing. The ALJ's conclusion in this respect is supported by substantial evidence and the proper application of the law.

Next, Mr. Thompson argues that while the ALJ properly found his "functional psychiatric disorder" to be a severe impairment, the limitations resulting from this impairment were not taken into account in the RFC. (ECF No. 15-1 at 21). Mr. Thompson relies on SSR 96-8p[4] for his argument that the RFC was deficient, and notes that a Mental Residual Functional Capacity Assessment dated January 29, 2010 indicated he was moderately limited in a number of areas related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (ECF No. 15-1 at 22) (citing Tr. 292-294).

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. SSR 96–8p, 1996 WL 374184. The ALJ must consider even those impairments that are not "severe" in formulating the RFC. 20 C.F.R. § 416.1520(a)(2). In determining a claimant's RFC, the ALJ must evaluate the claimant's subjective symptoms using a two-part test. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); 20 C.F.R. § 416.920. First, the ALJ must determine whether objective evidence shows the existence of a medical impairment that could reasonably be expected to produce the actual alleged symptoms. 20 C.F.R. § 416.929(b). Once the claimant makes that threshold showing, the ALJ must evaluate the extent to which the symptoms limit the claimant's capacity to work. 20 C.F.R. § 416.929(c)(1). At this second stage, the ALJ must consider all the available evidence, including medical history, objective medical evidence, and statements by the claimant. 20 C.F.R. § 416.929(c). The ALJ must assess the credibility of the claimant's statements, as symptoms can sometimes manifest at a greater level of severity of impairment than is shown by solely objective medical evidence. SSR 96–7p, 1996 WL 374186 (S.S.A. July 2, 1996).

Here, the ALJ found that Mr. Thompson was limited to performing unskilled work. This non-exertional limitation adequately takes into account the evidence of his moderate limitations in several areas related to mental functioning, as found by Dr. Ewell. (Tr. 23, 292-294). Mr. Thompson does not cite to any additional evidence besides Dr. Ewell's Mental Residual Functional Capacity Assessment to support his argument that the ALJ improperly failed to consider his mental and psychiatric problems when formulating the RFC. Instead, he argues that because Mr. Thompson's functional psychiatric disorder was found to be a severe impairment, then "by definition, [the impairment] must result in significant mental work related limitations."

---

[4] SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996), states:

[N]onexertional capacity must be expressed in terms of work-related functions. For example, in assessing RFC for an individual with a visual impairment, the adjudicator must consider the individual's residual capacity to perform such work-related functions as working with large or small objects, following instructions, or avoiding ordinary hazards in the workplace. In assessing RFC with impairments affecting hearing or speech, the adjudicator must explain how the individual's limitations would affect his or her ability to communicate in the workplace. Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.

(ECF No. 15-1 at 21). This argument fails to recognize that the ALJ properly accounted for these limitations by limiting Mr. Thompson to unskilled work. *See Fischer v. Barnhart*, 181 Fed. Appx. 359, 364 n.3 (4th Cir. 2006) ("'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'"). Accordingly, this argument is without merit, and I find that the ALJ's RFC assessment is supported by substantial evidence.

Next, Mr. Thompson argues that the ALJ failed to include pertinent information in his hypothetical question to the vocational expert ("VE"). (ECF No. 15-1 at 24). The Commissioner employs vocational experts to offer evidence as to whether a claimant possesses the residual functional capacity to meet the demands of past relevant work or adjust to other existing work. 20 C.F.R. § 416.960(b)-(c). The VE may respond to a hypothetical question about a person "with the physical and mental limitations imposed by the claimant's medical impairment(s)." 20 C.F.R. § 416.960(b)(2). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)). Social Security Ruling 00–4p states that the occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT," and any "apparent unresolved conflict[s]" must be resolved with a "reasonable explanation [by the VE]" before the ALJ relies on the VE's testimony. SSR 00–4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000).

Here, the ALJ asked the VE the following hypothetical question:

> under the assumption that I find a person such as the claimant with his age, education, and past relevant work experience can do work at the light exertional level; where he would be limited to unskilled work; where his activities of daily living are mildly restricted; where his social interactions are moderately restricted; where his attention, concentration, persistence, and pace would be moderately restricted; where he would have no episodes of decompensation of extended duration; where he would only occasionally be able to do the following: kneel, crouch, crawl, climb ramps or stairs, or bend; where he would never climb ladders, ropes or scaffolds; where he would not reach above shoulder level; where he would not be exposed to concentrations of dust, fumes, smoke, or other pulmonary irritants. . . . Could he do other jobs in the local or national economy?

(Tr. 53-54). The VE responded affirmatively. (Tr. 54)

Mr. Thompson argues that the ALJ should have incorporated into the hypothetical question that the person

> 1) has had several psychiatric in-patient hospitalizations which would cause him to miss time from work --- and takes very strong anti-psychotic medications affecting his ability to concentrate; 2) has COPD and severe asthma; 3) has a heart murmur; 4) is obese; 5) has high blood pressure for which he takes medication; 6)

7

has significant pain in his low back, leg, hip, and shoulder; 7) has sleep difficulties; 8) needs a cane to ambulate; and 9) is moderately restricted in at least eleven mental work related areas according to the Commissioner's own consultant, Dr. Ewell.

(ECF No. 15-1 at 25).

Here, the ALJ's hypothetical question to the VE matched the features of Mr. Thompson's vocational profile and the functional limitations of his RFC. While the ALJ did not incorporate into the question Mr. Thompson's specific medical problems, he was not required to do so. The ALJ's hypothetical question was only required to include functional limitations that result from Mr. Thompson's impairments. *See Ray v. Comm'r, Social Sec. Admin*, No. SAG-11-2397, 2012 WL 2860875, at *2 (D. Md. July 9, 2012) ("The ALJ's hypothetical is not intended to include diagnoses, but need only include any functional limitations resulting from those diagnoses."). VEs are not medical experts qualified to render opinions on how a certain *diagnosis* might affect a person's ability to perform work, but are qualified to render opinions on how certain *functional limitations* might affect a person's ability to perform work. Mr. Thompson does not point to any additional functional limitations that might result from the conditions he cites that were not addressed in the ALJ's hypothetical question to the VE. To the extent that Mr. Thompson argues that the ALJ should have included the functional limitations as found by Dr. Howard and Dr. Sippel, this argument is also without merit because the ALJ properly found that those opinions were entitled to little weight. The ALJ's hypothetical question fairly reflected Mr. Thompson's functional capacity and took into account all of his limitations. Mr. Thompson's argument to the contrary is meritless.

In Mr. Thompson's final argument, he contends that the ALJ harbored a bias against him that was "not conducive to rendering a fair decision" and that the ALJ failed to properly develop the record. (ECF No. 15-1 at 27). An ALJ has a duty to fully and fairly develop the record. *See Cook*, 783 F.2d at 1173. In addition, the regulations require that an ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 416.1440. ALJs are presumed to be unbiased, but this presumption can be rebutted upon a showing of actual bias. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("We must start, however, from the presumption that the hearing officers who decide Part B claims are unbiased."); *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir. 2003) (stating that "actual bias must be shown to disqualify an administrative law judge"); *Monseau v. Astrue*, No. 09-45, 2010 WL 1286200 at *3 (N.D.W.Va. March 29, 2010) ("The recusal standard for ALJs is a showing of actual bias.").

Mr. Thompson's argument is unfounded. While the ALJ could have been more diplomatic in some instances, his references to Mr. Thompson's past substance abuse and insubstantial work history are not improper. *See generally Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011). In addition, Mr. Thompson fails to specify how the ALJ's alleged bias resulted in any prejudice to him. Finally, although Mr. Thompson was represented by counsel and the regulations set forth a procedure by which a claimant may seek the recusal of a biased ALJ, neither Mr. Thompson nor his counsel objected to the ALJ's alleged bias. Even had Mr.

Thompson done so, his request for recusal would have been without merit, as there is no evidence in the record that the ALJ harbored any sort of bias against Mr. Thompson.

Little needs to be said about Mr. Thompson's argument concerning the ALJ's alleged failure to fully develop the record. It is the claimant's burden through the first four steps of the sequential evaluation to present evidence establishing disability. *See Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir. 1995). The claimant cannot shift that burden by contending that the ALJ shouldered the duty to procure additional records that were not offered by his attorney. *See Watson v. Comm'r, Soc. Sec. Admin.*, No. SAG-13-205, 2014 WL 583064 (D. Md. Feb. 12, 2014). The ALJ was not required to develop the record any further than he did in this case. That Mr. Thompson failed to present further documentation to the ALJ or the Appeals Council, especially when he was represented by counsel, does not serve as a basis to vacate the ALJ's decision.

For the reasons set forth herein, Mr. Thompson's motion for summary judgment (ECF No. 15) will be DENIED and the Commissioner's motion for summary judgment (ECF No. 16) will be GRANTED. The clerk is directed to CLOSE this case.

Despite the informal nature of this letter, it should be flagged as an opinion. An implementing Order follows.

Sincerely yours,

/s/
Timothy J. Sullivan
United States Magistrate Judge